# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUN 22 2004

LUTHER D. [illegible], Clerk
By: [illegible signature]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| FREDERICK HARPER, individually and on behalf of all present and future inmates in the Fulton County Jail in Atlanta, Georgia, ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 04-CV-1416 **MHS** |
| DEPUTY TYRONE BENNETT, individually; and FULTON COUNTY, GEORGIA; FULTON COUNTY BOARD OF COMMISSIONERS, KAREN HANDEL, Chairperson, ROB PITTS, EMMA I. DARNELL, WILLIAM EDWARDS, TOM LOWE, NANCY BOXILL, members; JACQUELYN BARRETT, Fulton County Sheriff, in their official capacities ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## AMENDED COMPLAINT

1. This is an individual action seeking compensatory, nominal, and punitive damages for injuries inflicted on Plaintiff Frederick Harper at the Bellwood Annex to the Fulton County Jail on April 25, 2004, and a class action seeking declaratory and injunctive relief with regard to conditions at the Fulton County Jail, pursuant

1



to the Civil Rights Act of 1871, 42 United States Code § 1983 and the Eighth, and Fourteenth Amendments to the United States Constitution. The class action is brought by Plaintiff Harper, who is now confined at the Fulton County Jail on Rice Street, as class representative of all current and future inmates at the Fulton County Jail.

2. The Fulton County Jail is extremely overcrowded, understaffed, and its plumbing, electric laundry, and ventilation systems are breaking down. The extreme overcrowding, the lack of adequate staff, the breakdown of systems, the presence of weapons in the jail, locks that do not work on many cells, and other deficiencies at the Jail are a lethal combination. Intervention by the Court is required to prevent the loss of life or serious injury in violation of the Eighth Amendment.

3. Plaintiff Harper is one of over 3,365 inmates crammed into the Jail and its annexes. The main Jail on Rice Street was originally designed for 1,375 inmates, but has over 3,000 people confined to it. Approximately 500 inmates sleep on the floors or in bunks in day rooms. When fully staffed, the Jail cannot safely house this many inmates. However, there presently a severe shortage of guards at the Jail. Sections of the Jail that were designed to be staffed by 14

2

guards are being staffed by two. There are insufficient guards to patrol the Jail. Both inmates and correctional staff have been assaulted. Some assaults have resulted in serious injury – one inmate lies at Grady Hospital in a coma from which he is not expected to recover. Plaintiff Harper, who has already been assaulted, lives in fear of further injury or even death.

4. The tension that results from too many people in too little space living in constant fear for their lives and safety is exacerbated by the breakdown of basic systems required for health and safety – plumbing, laundry, electric, and air handling systems – due to the strain put on them by far too many users. Many inmates live with the stench of raw sewage which comes up from drains, overflows from toilets and drips from ruptured pipes. There are leaking pipes throughout the Jail leaving stagnant pools of water on the floors. On occasion, floors where inmates sleep are flooded. In some housing units, only one shower works for approximately 60 inmates. The Jail is unable to handle the laundry needs of its inmates because of the volume and broken equipment. This results in a substantial risk of transmission of serious illnesses including diarrheal disease, boils, and hepatitis A. Inmates are denied medical care and medications because

3

of shortages of uniformed staff to take inmates to the infirmary and to escort nurses to the housing units to dispense medications.

5. Plaintiff Harper and other inmates at the Jail are being held in violation of their rights under the Eighth and Fourteenth Amendments of the United States Constitution. Plaintiff seeks declaratory and injunctive relief to remedy the conditions which are the basis for this action.

## I. JURISDICTION

6. This suit is brought under the Eighth and Fourteenth Amendments to the United States Constitution as enforced through 42 U.S.C. § 1983, and under O.C.G.A. §§ 9-2-20, 42-4-4 et seq., and 42-5-2 et seq. The Court has jurisdiction over plaintiffs' federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

7. This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## II. VENUE

8. The Northern District of Georgia is an appropriate venue for this action because defendants in their official capacities reside in this district. *See* 28 U.S.C.

4

§ 1391(b)(1). The Northern District of Georgia is also an appropriate venue because the events giving rise to plaintiffs' claims have occurred in this district. *See* 28 U.S.C. § 1391(b)(2).

### III. PARTIES

9. Plaintiff Frederick Harper is incarcerated on the fifth floor at the Fulton County Jail. On April 25, 2004, while at the Bellwood Annex to the Jail, he was handcuffed by Defendant Bennett, who caused Plaintiff to fall and sustain injuries to his head. Plaintiff Harper is currently housed on 5-North, Dorm 100. Three men are housed in each of the eighteen cells in the dorm. In addition, twelve to thirteen inmates sleep on the floor. While on 5-North Dorm 100, Plaintiff Harper has observed many fights and been threatened with assault. Some fights have resulted in inmates being rendered unconscious. Tension between inmates is very high. The dorm is very hot and humid. Ceiling tiles are missing in the unit and brown water leaks from the ceiling. Water leaks from the pipes and toilets. Rust, mildew, algae, and mold are visible in the showers. There are two functioning showers for approximately sixty men. Personal linens – including underwear – have not been laundered for two months. Instead, Plaintiff Harper and others in the Dorm wash their underwear and other personal linens in a mop bucket or bowl.

5

The laundry is hung around the dorm to dry. Plaintiff Harper has no lights in his cell. Plaintiff Harper is in constant fear for his life and safety.

10. Defendant Fulton County, Georgia is the governmental entity responsible under state law for properly maintaining, operating, and funding the Fulton County Jail. O.C.G.A. § 36-9-5; 42-5-2 (a). That duty includes providing an adequate number of correctional staff and space for the number o f inmates housed at the Jail; maintaining the plumbing, laundry, electric and ventilation systems at the Jail so that the Jail is operated in a safe, secure, sanitary and humane manner. In addition, it is the duty of the county "to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention." O.C.G.A. 42-5-2 (a).

11. Defendant Fulton County Commission and its members, Karen Handel, Emma Darnell, William Edwards, Robb Pitts, Tom Lowe and Nancy Boxill, are responsible for ensuring that Fulton County complies with its duties regarding the operation of the Jail set out in the foregoing paragraph. The Commission possesses the power under Article XI of the Georgia Constitution to levy taxes, initiate bond issues, and otherwise raise revenues and appropriate funds for hiring correctional staff and maintaining the Jail.

6

12. Defendant Jacquelyn Barrett is the Sheriff of Fulton County, Georgia. As Sheriff, Barrett is charged under Georgia law with the duty of taking "custody of the jail and the bodies of such persons as are confined therein," O.C.G.A. § 42-4-4(a)(1), to operate the jail and provide secure and healthy conditions of confinement, O.C.G.A. §42-4-4 (a)(1)-(2), and to remove inmates from the Jail and commit them to the jails of nearby counties should the Jail become unsafe. O.C.G.A. § 42-4-5 (a)(3).

13. Defendants are sued in their official capacities. They have all acted under color of law.

## IV. CLASS ACTION ALLEGATIONS

14. The Plaintiff brings this action on behalf of himself and all others who are similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. The members of the class consists of all inmates who are or will be incarcerated at the Fulton County Jail and are subject to the conditions described in this *Amended Complaint*.

15. At any given time, there are approximately 3000 inmates confined at the Jail. This large group changes size and composition on a daily basis as

7

inmates are taken into the Jail and released from it. Therefore, joinder of all Fulton County Jail inmates is impracticable.

16. There are questions of law and fact that are common to all class members. All are inmates at the Jail and endure the overcrowded conditions, staff shortages and systems breakdown which threaten their lives, health and safety. The same legal rights are common to all of the inmates at the Jail. The defendant Sheriff, County Commission, and the County Commission's members have the same legal duties and responsibilities with regard to all inmates at the Jail. And all of the inmates at the Jail have the same legal rights with regard to their personal health and safety.

17. The claims of the Plaintiff are typical of the claims of the class as a whole. The conditions and practices challenged in this action apply with equal force to the Plaintiff and all inmates at the Jail. Thus, the claims of the named Plaintiff are typical of those of the class.

18. The named Plaintiff will fairly and adequately represent the interests of the class as a whole. He is represented by counsel who have substantial knowledge of the Jail and its operations as a result of litigating *Foster v. Fulton*

8

*County* in this Court, have investigated conditions at the Jail, and are experienced in class action litigation involving jail and prison conditions.

19. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), class certification is warranted because the Defendants have acted or failed to act in a manner applicable to the class as a whole. Thus, final injunctive relief addressing the class as a whole is appropriate.

## V. FACTUAL ALLEGATIONS

20. Plaintiff Frederick V. Harper was booked into the Fulton County Jail on April 11, 2004, on a charge of burglary. Plaintiff Harper was initially housed in the Bellwood Annex of the Jail. While there, Plaintiff Harper was assaulted by a Defendant Deputy T. Bennett on April 25, 2004, and sustained injuries to his head, neck, and back. Plaintiff is currently housed on the fifth floor of the main Jail on Rice Street in tense, overcrowded, unsanitary, and dangerous conditions.

### A.    The incident at Bellwood

21. The altercation between Plaintiff came after a disagreement about an extra tray as breakfast as inmates were getting food at the Bellwood facility. At some point, Deputy Bennett told Plaintiff Harper to exit through a door with him. Harper proceeded with Deputy Bennett through the door. Once through the door,

9

Deputy Bennett slapped a food tray out of Plaintiff Harper's hands, made him turn around, and placed him in handcuffs very forcefully causing Plaintiff Harper a lot of pain. Deputy Bennett then forcefully moved Plaintiff Harper toward the holding cells. While doing so, Deputy Bennett kicked Plaintiff Harper's left foot behind his right foot. Plaintiff Harper lost his balance. He fell forward onto the concrete floor, hit the top of his head, and lost consciousness.

22. When Plaintiff Harper regained consciousness, Deputy Bennett was no longer present and Plaintiff was helped to his feet by another officer. While getting to his feet, Plaintiff Harper lost consciousness again. The next time he woke up, Plaintiff Harper was in the Jail infirmary. He received five stitches in his head. Plaintiff Harper asked the medical staff if he could go to Grady Hospital for x-rays, but he was refused

**B.    The Conditions at the main Jail.**

23. Since the incident with Deputy Bennett, Plaintiff Harper has been housed in 5-North 100 Dorm at the main Jail on Rice Street. The Jail "is in a state of crisis, necessitating immediate action to reduce the inmate population, increase security staffing, and repair and maintain the basic systems required for basic health and safety, such as laundry, plumbing, electricity, and air handling." This

10

assessment was made by Dr. Robert Greifinger, M.D., in a report to Fulton County dated May 31, 2004. Dr. Greifinger was a consultant with regard to health care at the jail, initially for the United States District Court and then for Fulton County. After inspecting the Jail on May 26-27, he reported, "the severe overcrowding and staff shortages have resulted in mounting tension within the living units." The report is appended as Exhibit A and is hereby incorporated by reference as if fully set out in this *Amended Complaint.*[1]

24. The Jail is dangerously overcrowded. The Jail was designed to have 1332 beds in cells and 44 infirmary beds. While it was being constructed, a decision was made to double bunk floors 1-5, thereby adding 918 beds. However, while the number of beds was increased, the amount of living space and the number of toilets, showers, and sinks was not increased. Since that time, additional beds have been added on the sixth and seventh floor and even a third bed has been added to some cells. The official "capacity" of the Jail is 2,250 plus 44 infirmary beds, but even that many people strains the Jail's plumbing, electrical, ventilation and laundry systems, which were designed for 1,332. At this

---

1. The report is contained in a letter from Dr. Greifinger to Paula Morgan Nash of the Fulton County Attorney's office, dated May 31, 2004.

11

time over 3,365 inmates are at the Jail and the two annexes, Bellwood and Marietta. Because there are simply too many inmates in the Jail, the living areas have become extremely crowded. Approximately 500 inmates sleep on the floor or on bunks in the common areas of the Jail. On 5-North, Dorm 100, where Plaintiff Harper is currently housed three men are housed in each of the eighteen cells and twelve to thirteen men sleep on the floor.

25. The Jail is dangerously understaffed. There are not enough guards.[2] This condition results in danger to both correctional staff and inmates. In some units, the only correctional staff is a single officer in a glass booth; there are no officers to patrol the units. Due to a hiring freeze, approximately 90 positions are unfilled. Employees at the jail have been fired or suspended when inmates were erroneously released, a rap video was filmed at the Jail, and other improper activities occurred at the Jail. Because of the shortage of staff, there are unacceptably long delays in responding to emergency calls, whether to break up an altercation or to provide medical care for an inmate; food is often cold when it

2. Throughout this *Amended Complaint*, the terms "guard," "correctional officer," "deputies" and "staff" all refer to employees of the sheriff's office who have the responsibility for providing security at the jail.

12

finally reaches the housing units; legal visits are delayed, and inmates sometimes

do not see medical personnel or get needed medication. But the most significant

consequence of the understaffing is that neither correctional staff or inmates are

safe from violence which is common at the Jail.

26. The basic systems at the Jail are failing. Locks on many cells do not

work. The physical plant, and the plumbing, electric, ventilation and laundry

systems at the Jail are not designed for use by the number of people at the Jail and

are failing due to the demands placed upon them. Dr. Greifinger reported:

> The air handling systems are overburdened; they break down. The
> HVAC controls do not work. There are leaking pipes throughout the
> facility, broken or missing security cameras, damaged ceiling tile and
> overflowing toilets. On 5 North, body heat alone uses more than 50%
> of the air-conditioning capacity. The plumbing problems persist, with
> toilet leaks and inoperable sinks. The electrical systems are so
> strained that power regularly goes out in the dental unit. It is almost
> impossible to work productively in this environment.

*See* Exhibit A, page 3. He found that the maintenance staff, with an average 1,300

work orders per month, simply cannot keep up. *Id.*

27. The number of people at the Jail is too many for its plumbing system.

Sewage overflows from some toilets, leaks from the bottom of others and drips

from pipes. This problem is so persistent in some units that some inmates have

difficulty keeping down food and medicine. Many showers and sinks at the Jail

13

do not work. Throughout the Jail, leaks from pipes creates stagnant pools of water on the floor.

28. The air handling systems have failed in many parts of the Jail. As a result, inmates crowded into inadequate space experience excessive temperatures, which adds to tension and poses a health risk as well. Dr. Greifinger described one housing unit as follows:

> Wet clothing draped the railings-hopeful to dry in humidity exceeding 90%. The temperature was well over 80 degrees. Hot, especially for patients on psychotropic medications that make them vulnerable to heat injury such as heat stroke. Puddles outside the showers, mold inside, mold like a fur carpet on the ceiling. Acrid. The air conditioning cannot keep up with the heat and moisture.

*See* Exhibit A, page 2. There is mold and mildew throughout the Jail.

29. The laundry system has failed. For months inmates have not been able to get their underwear cleaned. This poses a health threat and contributes to the excessive humidity at the Jail. Dr. Greifinger reported:

> The laundry is in crisis. On the days of my visit, all the dryers in the main jail had been broken for a week. . . . The inmates are washing their own underwear, in their little sinks with hand soap, hanging them to dry on the railings. This is unsanitary. The wet laundry further humidifies the air, already wet with perspiration from the crowding and the inadequate air handling equipment.

\* \* \*

14

Dirty and wet laundry pose substantial risks of transmission of illnesses, such as diarrheal disease, drug-resistant boils, and hepatitis A.

To prevent outbreaks of these illnesses, the Jail must provide clean underwear and uniforms daily and at least twice weekly bed-linens and towels.

*See* Exhibit A, pages 3, 4.

30. The overcrowding, inadequate staffing, raw sewage, heat, humidity,

mold, and other conditions at the Jail result in tension that leads to violence. Dr.

Greifinger described the fifth floor of the jail as follows:

It was dank, full of sweaty bodies. The air was thick with the scent of wet underwear. Rank. Each zone the same. Wet laundry on the railings. Raised voices. Noisy. Crowded. Inmates buzzing about, milling randomly, a few banging on the zone doors. Mattresses on the floor in the day room. No duty officers in sight. It was very hot indoors this pleasant Spring day. The air-conditioning had been broken for days. There are two showers on a zone; zone 5 North 500 has 59 inmates, 18 sleeping on the floor. 5 South has 326 inmates, but only 12 showers. This is a unit built for 108, or about 200 double-bunked. There are broken ceiling tiles and water dripping from the ceilings into garbage pails.

*See* Exhibit A, page 1. Outbreaks of violence, which are common, put the lives

and safety of inmates and correctional staff in danger. Both inmates and

correctional staff live in constant fear for their safety and lives while confined at

15

the Jail. Correctional staff do not want to be assigned to units without sufficient backup, but they are nonetheless because there is no alternative.

31. There has already been substantial violence, leading to severe injury and there will be more unless immediate action is taken to reduce the Jail's population and increase the correctional staff. Understaffed and overwhelmed correctional officers are unable to quickly end altercations between inmates. Fights that are not broken up quickly can result in great bodily harm. One inmate, Anthony Wimbush, was assaulted by four other inmates on the sixth floor of the Jail and beaten so badly that he sustained serious head trauma and brain damage. He is in a coma and is not expected to recover. Another inmate, whose ear was partially bitten off in a fight, did not get immediate treatment because no guard had seen the attack. Another inmate committed suicide. Fights are common and both inmates and staff have been injured. A sufficient number of correctional staff at the Jail could have prevented these and many other incidents.

32. Another factor contributing to the overcrowding at the Jail is that people are "lost" at the Jail and there are unacceptably long delays while people are held there before going to Court. For example, Nguyen Hen Van, a mentally ill Vietnamese man who speaks no English, was in the Jail for 19 months,

16

apparently for purposes of a competency examination. While there, he was never seen by the mental health staff at the Jail. Another inmate, Willie Hill, was committed to the Jail on November 23, 2003, after being sentenced to time served for jaywalking in municipal court. In the seven months that he has been at the Jail, he has not seen a lawyer or been to Court. Timothy Grier, who is serving a sentence at the Hancock State Prison, was brought to the Jail on March 9 for a civil case, which was resolved on March 11. Nevertheless, he has not been returned to the state prison.

33. There are people in the Jail waiting for court proceedings who could be in the community. People arrested for minor offenses could be released after arrest without spending a night at the Jail. Instead, they are booked into the Jail, taken to first appearance hearings one to three days later and, even if ordered released, remain in the jail several more days before being released, thus unnecessarily occupying a bed for as long as a week. People charged with violations of probation are arrested and housed at the Jail while awaiting revocation hearings; they could be summoned to those hearings.

34. The policies, practices and conditions challenged in this lawsuit are the result of deliberate indifference on the part of defendants to the substantial risk of

17

death or serious harm for inmates at the Fulton County Jail. All defendants know about this risk, which is longstanding, pervasive, well-documented, and apparent to any knowledgeable observer. The many problems of the Jail have been widely publicized and even acknowledged by some of the defendants. The Fulton County Board of Commissioners heard on June 16, 2004, from people with various perspectives on the Jail about the problems there. The policies, practices and conditions challenged in this case have caused and, unless enjoined, will continue to cause needless suffering and an ongoing risk of death or serious injury to corrections staff and inmates.

35. Plaintiff and members of the class have exhausted all administrative remedies available to them. Plaintiff Harper filed a grievance on or about April 28, 2004, addressing the assault by Deputy Bennett. He did not receive a response. Numerous grievances regarding the conditions at the Jail have not received a response.

## VI. CLAIMS FOR RELIEF

36. The following claims are supported by reference to the previous paragraphs in this *Amended Complaint* and Exhibit A, which is appended and incorporated by reference as if fully set out herein.

18

## Count I

37. The conditions of confinement at the Jail and defendants' deliberate indifference to those conditions, as well as their policies and practices in administering and overseeing the Jail, considered both discretely and in their totality, constitute cruel and unusual punishment in violation of plaintiffs' rights under the Eighth and Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983.

## Count II

38. The conditions of confinement at the Jail and defendants' deliberate indifference to those conditions, as well as their policies and practices in administering and overseeing the Jail, considered both discretely and in their totality, constitute a denial of due process in violation of plaintiffs' rights under the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983.

## Count III

39. The failure of defendants Fulton County and the Fulton County Board of Commissioner to properly maintain, operate, and funding the Jail to "maintain

19

the inmate, furnishing him food, clothing and any needed medical and hospital attention" violates plaintiffs' rights under O.C.G.A. § 42-5-2.

## Count IV

40. The failure of defendant Barrett to provide secure, safe and sanitary conditions of confinement, to provide timely and sufficient medical care for inmates, and to remove inmates from the Jail and commit them to the jails of nearby counties because the Jail has become unsafe violates plaintiffs' rights under O.C.G.A. §§ 42-4-4 (a)(1)-(2), and 42-4-5 (a)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Assume jurisdiction over this action;

2. Order that this case may be maintained as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure;

3. Declare unconstitutional and unlawful the conditions of confinement and treatment of inmates at the Jail;

4. Enter a permanent injunction requiring the defendants, their successors, agents, employees, and all persons acting in concert with them, to take immediate steps to provide inmates with a safe, secure and sanitary environment, including

20

but not limited to the following: (1) require the defendants to employ adequate number of trained staff as needed to operate the Jail properly, to protect the inmates from assaults, to respond to emergencies, to escort inmates to the infirmary, and to accompany nurses on the floors for distribution of medication; (2) require the defendants to repair and maintain the plumbing and laundry systems to achieve sanitation and personal hygiene; (3) require defendant to provide adequate ventilation for the number of people at the jail; and (4) prohibit the defendants from having any inmates sleep on the floor.

5. Award plaintiffs costs of this lawsuit and reasonable attorney's fees; and,

6. Order such additional relief as the Court may deem just and proper.

Respectfully submitted this 22d day of June, 2004.

<div align="center" style="margin-left:40%">

STEPHEN B. BRIGHT
GA Bar No. 082075
JOSHUA R. LIPMAN
MS Bar No. 101399*
VANESSA BUCH
GA Bar No. 092122
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Telephone: 404/688-1202
Facsimile: 404/688-9440

</div>

21

JOHN F. SWEET
GA Bar No. 694950
Clements & Sweet, P.C.
175 Trinity Avenue, S.W.
Atlanta, Georgia 30303-3618
Telephone: 404/688-6700
Facsimile: 404/688-6703

*Counsel for the plaintiff*

By: _____
Stephen B. Bright

*Applying for admission to this Court
pro hac vice.

22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FREDERICK HARPER, individually and on behalf of all present and future inmates in the Fulton County Jail in Atlanta, Georgia,<br><br>    Plaintiffs,<br><br>v.<br><br>DEPUTY TYRONE BENNETT, individually; and FULTON COUNTY, GEORGIA; FULTON COUNTY BOARD OF COMMISSIONERS, KAREN HANDEL, Chairperson, ROB PITTS, EMMA I. DARNELL, WILLIAM EDWARDS, TOM LOWE, NANCY BOXILL, members; JACQUELYN BARRETT, Fulton County Sheriff, in their official capacities<br><br>    Defendants. | CIVIL ACTION<br><br>NO. 04-CV-1416 |

## CERTIFICATE OF COMPLIANCE

I, Stephen B. Bright, do hereby certify that the foregoing document has been

prepared in 14-point Times New Roman font and complies with LR 5.1B.

STEPHEN B. BRIGHT
GA Bar No. 082075
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Telephone: 404/688-1202
Facsimile: 404/688-9440

*Counsel for the plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| FREDERICK HARPER, individually and on behalf of all present and future inmates in the Fulton County Jail in Atlanta, Georgia, <br><br> Plaintiffs, <br><br> v. <br><br> DEPUTY TYRONE BENNETT, individually; and FULTON COUNTY, GEORGIA; FULTON COUNTY BOARD OF COMMISSIONERS, KAREN HANDEL, Chairperson, ROB PITTS, EMMA I. DARNELL, WILLIAM EDWARDS, TOM LOWE, NANCY BOXILL, members; JACQUELYN BARRETT, Fulton County Sheriff, in their official capacities <br><br> Defendants. | CIVIL ACTION <br><br> NO. 04-CV-1416 |

I, Stephen B. Bright, do hereby certify that on this day I served a copy of the

foregoing *Amended Complaint* by first class United States mail, upon counsel for

the defendants:

      The Honorable Overtis Hicks Brantley
      Fulton County Attorney
      141 Pryor Street, Suite 4038
      Atlanta, GA   30303

This 22nd day of June, 2004.

STEPHEN B. BRIGHT
GA Bar No. 082075
Southern Center for Human Rights
83 Poplar Street, N.W.
Atlanta, Georgia 30303-2122
Telephone: 404/688-1202
Facsimile: 404/688-9440

*Counsel for the plaintiff*

FILED IN CLERK'S OFFICE
U.S.D.C Atlanta

$\mathcal{Pew}$
JUN 2 5 2004

LUTHER D. THOMAS, Clerk
By: $\textcircled{ek}$
Deputy Clerk

May 31, 2004

Paula Morgan Nash, Esq.
Office of the Fulton County Attorney
141 Pryor Street, S.W.        Suite 4038
Atlanta, GA 30303

Dear Ms. Nash:

I visited the Fulton County Jail on May 26 - 27, 2004, to review health care and jail conditions for the 18th time in almost five years. As has been customary during this period, following my visit, I met with members of the jail staff, the medical staff, and counsel for Fulton County and for the inmates to discuss my findings. Nothing I said came as a surprise to anyone; it was generally acknowledged by everyone present at the meeting that there are major problems at the Jail that make health care delivery extremely difficult. The dismal environmental conditions and poor maintenance at the Jail were also recognized by everyone.

As I have reported numerous times in the past, these conditions substantially increase the risk of transmission of illness among inmates and staff. Moreover, the severe overcrowding and staff shortages have resulted in mounting tension within the living units, leading to violence and even death. Below are my specific observations. Overall, I believe the Jail is in a state of crisis, necessitating immediate action to reduce the inmate population, increase the security staffing, and repair and maintain the basic systems required for basic health and safety, such as laundry, plumbing, electricity, and air handling.

### 5 North and 5 South: Two Sides of the Fifth Floor of the Jail

It was dank, full of sweaty bodies. The air was thick with the scent of wet underwear. Rank. Each zone the same. Wet laundry on the railings. Raised voices. Noisy. Crowded. Inmates buzzing about, milling randomly, a few banging on the zone doors. Mattresses on the floor in the day room. No duty officers in sight. It was very hot indoors this pleasant Spring day. The air-conditioning had been broken for days. There are two showers on a zone; zone 5 North 500 has 59 inmates, 18 sleeping on the floor. 5 South has 326 inmates, but only 12 showers. This is a unit built for 108, or about 200 double-bunked. There are broken ceiling tiles and water dripping from the ceilings into garbage pails.

Extremely tense. Each of my senses raising an alarm. Scary. With almost two decades of visiting inmate housing units, it was the first time that I declined to go in.

ROBERT B. GREIFINGER, M.D.                                  PHONE: (914) 693-9205
32 PARKWAY DRIVE                                                  FAX: (914) 674-0113
DOBBS FERRY, NEW YORK 10522-3517                E-MAIL: robert.greifinger@verizon.net

*3 North:* The "Mental Health Dorm"

Down to 3 North. Two hundred seventy-three bodies in an area built for 108. Half of the inmates are diagnosed with major mental illness. Some have disorders of thought and others disorders of mood. The situation was fragile. Inmates sleeping on the floor in the day room. Mattresses only. No room for the "boats," the sled-like cradles for the mattresses, intended to keep the mattresses and bed linens from direct contact with the floor.

Stepping inside, I sloshed through puddles formed by the dripping condensation in the air handling system. The puddles around the showers were slick. Wet clothing draped the railings–hopeful to dry in humidity exceeding 90%. The temperature was well over 80 degrees. Hot, especially for patients on psychotropic medications that make them vulnerable to heat injury such as heat stroke. Puddles outside the showers, mold inside, mold like a fur carpet on the ceiling. Acrid. The air conditioning cannot keep up with the heat and moisture. Sleepy, quiet.

An officer pointed out Nguyen Hen Van, who didn't speak English. Mr. Nguyen has been behind bars since October 2002 on a low level felony charge. He was ordered by the Court to have a competency evaluation at Georgia Regional Hospital, but the Court never told Georgia Regional. Mr. Nguyen was lost in the system for 19 months, locked up, with no one who could understand him. Never seen by mental health staff at the jail because no one asked them. This is a failure of the courts. I shuddered in disbelief.

In 3 North, a nurse was giving out medications through the food trap on the door to the day room. No conversation was possible between her and the mentally ill inmates behind the door. She should have been inside, checking identity, administering prescribed medications one dose at a time, inquiring about side effects. But she would need an escort. There was no duty officer to escort her. So the nurse did her best to care for her patients.

*3 South:* Chronic Disease

3 South houses patients with chronic illness such as HIV. Same environment, but neither tense nor sleepy. Complaints about cold food, late medications, some days no medications. These were valid complaints. There are not enough duty officers to give out food when it is delivered from the sparkling new kitchen. There are not enough duty officers to escort and protect the nurses. There are not enough duty officers to bring patients to see the doctor or the dentist. As a result, inmates with chronic illness regularly (15 - 20%) miss their appointments.

*1 North:* Women's Housing

1 North houses the women. Same environment: hot, wet, crowded, tense. Mattresses directly on the floor of the day room.

### Intake Unit

The new intake unit is also crowded. There is insufficient staff to classify the inmates as they come in. Most inmates spend more than 24 hours until they are booked. They spend this time in a small crowded holding cell. More than 24 hours until they are screened by a nurse for acute and chronic illness. More than 24 hours until the nurse can interview them to see if they have symptoms of contagious tuberculosis. More than 24 hours until they can get to see a doctor to write prescriptions for their medications for HIV or mental illness. Intakes have increased by more than 50% in the past six months, but staffing has not increased. Nurses are commandeered to the intake unit from the floors. This delays sick call and medication administration. These delays can be dangerous for people who are acutely ill or who need medication on a strict schedule, such as people with diabetes or HIV.

Because of the backlogs in intake, some inmates are sent directly to 2 North without being formally booked. They don't get medical screens, or, if they do, it is sometimes hard to identify who is who. This is because they may use an alias in the intake unit. Prescriptions are written in one name and health staff may not know who to give medication to when they are later booked with another. This further delays medication administration.

### Overcrowding and System Failures

On May 24, 2004, there were 3,299 inmates in custody, 3,035 in the main jail. The main jail was built for half this number. The court order in 1999 limited the main jail to 2,250, but this order expired in late 2002. A full 500 inmates were housed in the facility without cells, sleeping on the floors in the day rooms.

The maintenance staff cannot keep up. They spend 90% of their time on repairs and only 10% on preventive maintenance. They average 1,300 work orders per month. The air handling systems are overburdened; they break down. The HVAC controls do not work. There are leaking pipes throughout the facility, broken or missing security cameras, damaged ceiling tiles and overflowing toilets. On 5 North, body heat alone uses more than 50% of the air-conditioning capacity. The plumbing problems persist, with toilet leaks and inoperable sinks. The electrical systems are so strained that power regularly goes out in the dental unit. It is almost impossible to work productively in this environment.

### Laundry

The laundry is in crisis. On the days of my visit, all the dryers in the main jail had been broken for a week. Only one dryer was functioning at Bellwood, an annex next door. The inmates are washing their own underwear, in their little sinks with hand soap, hanging them to dry on the railings. This is unsanitary. The wet laundry further humidifies the air, already wet with perspiration from the crowding and the inadequate air handling equipment. The Sheriff has spent at least $500,000 on outsourced laundry services for uniforms and towels, but the outside laundries will not do underwear.

Dirty and wet laundry pose substantial risks of transmission of illnesses, such as diarrheal disease, drug-resistant boils, and hepatitis A.

To prevent outbreaks of these illnesses, the Jail must provide clean underwear and uniforms daily and at least twice weekly bed-linens and towels.

### Staff Shortage

There is a severe shortage of uniformed staff, with more than triple the usual vacancies of the past few years. But the vacant positions are frozen. Each new vacancy becomes a permanent vacancy. Vacancies are occurring at a rate of 80 per year. On May 24, 2004, there were 94 unfilled positions for uniformed staff. Absent duty officers, there is vandalism that creates a higher maintenance burden. Sergeants are doing what they can, as duty officers. But this leaves duty officers with less supervision. Health care staff has few escorts, so inmates do not get to see their physicians and do not get their medication when they need it. Uniformed staff shortages are reducing productivity of the health care staff. Because of these shortages, approximately 18% of scheduled dental appointments and 20% of sick calls and chronic care visits are missed. The appointments roll forward, increasing the demands on the schedule. We have not had a problem of this magnitude in four years.

The lack of security and heightened tension level that result from uniformed staff shortage also leads to serious injury and possibly death of inmates. This Spring, an inmate sustained head trauma and serious brain damage as a result of an assault in the housing unit. During my tour he was on life-support at Grady Medical Center. There were insufficient numbers of security staff available to break up the fight. Another inmate died of suicide, a death that might have been averted with better staffing and inmate supervision.

### Positive Notes

Despite the extremely adverse working conditions, the health care staff continues to perform well. To the extent that the health care staff does not face barriers caused by security staff vacancies and faulty mechanical systems, the quality of medical care is good. The performance measurement system is in place. Once inmates actually do get to see the health care staff, the performance exceeds 85% on most measures.

There is a new pharmacy program with a correctional pharmacy called Secure Plus. The formulary has not been compromised by eliminating effective but expensive medications. A tickler system is working to prevent lapses between refills. There is a substantial cost-savings to the County with the new program.

The mental health program has been consolidated with the medical care program. This should help with staffing economies and communication.

There are only three or four nurse vacancies. In light of the nursing shortage and difficulties correctional facilities are having nationwide, this is a very low vacancy rate.

### Conclusions

Jail staff appears to be doing everything they can with limited resources. The courts control the census, the County controls the staff vacancies, and the main jail physical plant is inadequate. There is inadequate funding for preventive maintenance.

Correctional Medical Associates, Inc., the vendor for medical and mental health care, is functioning as well as it can, given the barriers described above.

I fear the onset of summer:

- The tension level among both staff and inmates is already high. The stresses continue unabated.

- The overcrowding is increasing. The jail is an extremely uncomfortable living and working environment.

- The air-handling systems, plumbing, and electrical systems cannot keep up due to crowding, poor construction and underfunded maintenance. The housing units are unsanitary.

- The laundry is not functional. Sink-washing of underwear is not hygienic and contributes to the demand on the air handling systems.

- Uniformed staff vacancies are increasing, reducing levels of inmate supervision and interfering with the provision of timely medication and medical care.

- Intake is functioning poorly, posing health risks to the staff and inmates.

- Inmates are at risk of heat injury. They are especially vulnerable if they are on psychotropic medications or other selected medications. Inmates and staff are at risk of widespread transmission of communicable disease because of the crowding, the heat, and the inadequate laundry.

  The facility needs a heat policy. When the heat index (a calculation of temperature and humidity) reaches or exceeds 88, vulnerable inmates need air conditioning, extra liquids and increased access to showers. Vulnerable inmates include those on antipsychotic, antihistamine, or anti-hypertensive medication and those with chronic diseases such as diabetes, chronic lung disease, end-stage renal disease and heart disease. Between 12% and 15% of the inmates in this facility classify as heat vulnerable.

- Health care staff is also tense and dispirited. Staff is frustrated because of the barriers to doing their jobs. The psychiatrists have to see their patients on the housing units, but can only talk to them through the cracks in the cell doors or kneeling down, through the food traps. Patients are not getting to see the doctors and dentists. The nurses are unable to deliver medications on time.

These problems are serious. Lapses in medication and care cause harm. Inmates are less satisfied and more likely to get agitated. Staff turnover will increase if the barriers to care are not reduced.

In my opinion, the Fulton County Jail needs immediate intervention by responsible county officials to prevent serious harm to staff and inmates. The County must address the problems created by crowding, staff shortages, laundry, and mechanical systems with all possible haste.

Sincerely,

Robert B. Greifinger, M.D.

cc:    Sheriff Jacqueline Barrett
Lloyd Baccus, M.D.
George Herron
Tamara Serwer, Esq.
Chip Rowan, Esq.