# First Quarterly Report
# Of the Court Monitor

FILED IN CLERK'S OFFICE
U.S D.C. Atlanta

MAY 1 5 2006

LUTHER D. THOMAS, Clerk
By:
    [signature] Deputy Clerk

RE: *Harper, et al. v. Fulton County et al.*
CIVIL ACTION NO. 04-CV-1416-MHS

## Introduction

A Consent Order was filed in this action on December 21, 2005. Section V of the Order provided for the appointment of a monitor who would inspect the jail at least quarterly and provide a report to the Court and the parties. After consideration, the parties agreed that I should function as monitor and the Court subsequently approved the appointment. After allowing time for the plaintiff class to comment on the Consent Order and a Fairness Hearing, I visited the Fulton County Jail during the last week of March 2006.

During the first visit I had an opportunity to meet with the Sheriff and a large number of jail administrators and managers. I received a basic orientation to the jai, had time to tour parts of it, and was provided with a good deal of historical and factual information both orally and in writing. Time constraints left me little chance to talk with line staff and prisoners, a deficiency I intend to correct in future visits.

I am grateful to the Sheriff for his openness and his generous sharing of time with me. I also want to thank the many others at the jail who were helpful to me. The deficiencies in this first report result from my own limitations and the complexity of the jail and its problems, not from any lack of cooperation.

The report, then, will necessarily be somewhat superficial and consist more of impressions than conclusions. It will not cover all the specific requirements of the Order nor make final determinations of compliance or non- compliance. Rather, using the Consent Order as a guide, I will try to organize some thoughts around several large issues that seem central to understanding and eventually solving the countless particular problems that have plagued the jail over the years.

The First Quarterly Report of the Court Monitor is submitted in response to the requirements of Section V of the Consent Decree. It is based on my visit to the jail on March 28, 29 and 30, 2006, and on documents received during and subsequent to that visit. I have also relied on numerous telephone calls, e-mails, letters and other communications.

## Overcrowding

The Consent Order is clear that, on average, no more than 2,250 prisoners are to be housed in the main jail. It also sets the capacity for the Bellwood and Marietta annexes at 200 and 100 respectively. Finally it directs that no inmate be required to sleep on the floor and that no more than two inmates be housed in a cell.

Inmates have not been required to sleep on the floor, but the defendants have been unable to sustain compliance with the other population limits. During this reporting period, the annexes have been out of compliance frequently, and the main jail has remained consistently over the cap since experiencing a brief period of compliance at the end of March. The numbers suggest that the March dip was the result of fortunate coincidence, and not the beginning of a sustainable trend.

The Sheriff has relieved some pressure on the jail by boarding prisoners in other facilities, notably the Atlanta City Jail. This practice (which jail staff refer to as "outsourcing") has provided space for an average of 200 plus inmates but the prospect for increasing that number in the near term seems limited. Jail administrators have discussed expanding the program, especially for longer-term inmates, by using jails in South Georgia and compensating for the distance with sophisticated telecommunications. They have been cautioned about court-access and visitation issues, and I presume those admonitions are part of their ongoing deliberations.

Some triple-bunking of prisoners continues, although modifications to inmate classification had allowed defendants to vacate the third bunk in 125 three-man cells at the time of my visit. The absence of additional local beds for boarding prisoners stymied further efforts to reduce triple-bunking and the need to temporarily re-locate prisoners because of recent plumbing problems also slowed down the process.

2

There has been improvement in the reduction of state-sentenced inmates housed in the jail. In January 2006 there were 191 inmates in the jail who had been legally sentenced to the Department of Corrections (DOC). The Sheriff's request to the DOC and an agreement to streamline paperwork processing has now reduced to a more reasonable number those awaiting transfer to state facilities.

The Consent Order requires that pre-trial prisoners be released within 24 hours after the jail receives documentation that they are eligible for release. The defendants maintain that they have been in compliance with this requirement except during a weekend in March when a computer system breakdown resulted in delays despite the jail's aggressive response to the problem. I have not seen any reports listing inmates who were detained more than 24 hours in violation of this provision of the Order.

* * * * *

Overcrowding either causes or exacerbates all of the other problems that plague the jail. It is so difficult to control because it results from a hodge-podge of policy and discretionary choices made by a variety of well-intentioned people, who rarely speak with one another and who are largely unaware of the impact their collective actions have on overcrowding the jail.

There are six law enforcement agencies, for example, whose discretionary decisions on the street determine over 90% of the jail's admissions. Once at the jail, a whole other cast of characters becomes involved in deciding whether or when an individual will be released. Prosecutors then decide whether to charge and for what crime, while public defenders and other attorneys meet with prisoners ---or don't--- and work out plea agreements. Probation officers' decisions affect jail numbers and judges, of course, exercise discretion in scheduling, setting calendars, and in the trial process. All of these discretionary decisions are made within an intricate web of custom and statute.

Uncoordinated, discretionary decisions have determined the size and composition of the jail' population. "Get tough" attitudes toward crime in recent years have doubtless influenced choices and increased the jail numbers, even though that was rarely their considered purpose. Because the origins of jail overcrowding are so complex, simple solutions don't work

3

and it usually takes some "crisis," like a court order, to force the untangling of the web.

Finding solutions will require collaboration at many levels of the criminal justice system and beyond, and will involve individuals and groups who would prefer to think that the "jail problem" is the Sheriff's alone. Fully understanding the problem and putting together the pieces to a lasting solution will take time and cooperation but that, it seems, is the task at hand.

### Staffing Issues

The defendants acknowledge that they do not comply with the Order's staffing requirements. Indeed, a staffing analysis, which used a professionally accepted methodology, was completed recently by the Corrections Bureau off the Sheriff's Office and revealed a large discrepancy between the positions required and the positions available. This result echoes findings of several other external and internal staffing analyses in recent years, which found that the jail was seriously understaffed.

In addition to sheer numbers, proper training, deployment, and supervision have important implications for staff coverage. Jail managers are attempting to push officers and supervisors to regularly and frequently complete security rounds in the jail, but a review of logs and records reveals a chasm between current practice and the level of staff movement necessary for the safe operation of the jail. What is encouraging is the jail's willingness to document the deficiency and attempt to correct it, rather than cover it up.

Discussions continue between the Sheriff's Office and the County Commissioners about additional staff for the jail, but It would be foolhardy to suggests that there will be cheap or easy "solutions" to the staffing dilemma. This will continue to a major issue during the pendency of this litigation, but two points should be raised at the outset.

First of all, the high staffing requirements of the Fulton County Jail are part and parcel of the physical structure itself. The configuration of space, especially in the housing units, is such that a relatively large

number of staff will be required to operate it safely. This was a costly error when the jail was first built and remains an expensive liability today. Any discussion of long- term use of the building for detention must consider whether it can be made sufficiently staff-efficient that it will be fiscally responsible to operate. Perhaps creative architectural modifications can mitigate the inefficiencies and those possibilities should be explored, but those planning for the detention needs of Fulton County need to face squarely the building's limitations and the high cost of staff to compensate for them.

Secondly, not having enough staff jeopardizes the safety of prisoners and staff alike, and compromises the security of the facility; having sufficient staff is not optional. At the same time, staff salaries and benefits represent, by far, the largest cost of operating the jail. While the Sheriff needs to continue his efforts to obtain and deploy enough staff to meet the jail's immediate needs, county policy-makers need to decide the long-term use of the present building, given the very high staffing costs that will likely be associated with its continued operation. The volatility and difficulty of that decision do not diminish its importance.

### The Infrastructure: Maintenance, Replacement and Repair Of Mechanical, Plumbing and Electrical Systems

Many provisions of the Consent Order aim to correct ongoing problems with the plumbing, electrical, and mechanical systems in the jail. Some requirements are immediate and others give the defendants until the middle of 2009 to correct. A compliance checklist, which jail managers have devised for self-monitoring, suggests that a good start has been made but they remain out of compliance in many areas. I anticipate that future visits will allow time to verify and document progress with some of these provisions.

There seems little debate that over the jail's relatively short lifetime, overcrowding has severely taxed and finally worn out many of the infrastructure systems. Shortly after my visit to the jail in March, sequential breakdowns in several of the systems served to underline that reality.

On April 7, water was observed apparently seeping up from a sewer line outside the jail. When the water began to enter a recreation area of the north tower, some inmates were temporarily moved although there is

no indication that sewage actually entered a housing area. Beginning on August 8, outside contractors began to isolate and eventually repair the leaking sewer line but not before encountering and being delayed by underground power lines and having to re-locate an undermined perimeter security fence. Work on the sewer line appears to have continued through the end of April.

Meanwhile, an apparently unrelated malfunction occurred on April 10 in the pressure- regulating valve in the main water supply to the jail. The resulting fluctuations in water pressure caused some older plumbing fixture components to fail and resulted in flooding. Although this was potable water from supply lines and not sewage, sediment from the lines gave the water an unpleasant appearance and led to the belief among some that it came from a sewage backup. After the problem was diagnosed, the water pressure-regulating valve was replaced on April 21, although some flooding continued until necessary adjustments were made and worn plumbing components were replaced.

On April 12, in the midst of all this, a hot water pipe ruptured and flooded the visitation elevator pits and housing zones adjacent to the elevators. As a safety measure, the elevators were taken out of service and this caused the cancellation of visitation on April 13 and 14.

Even though the three incidents were unrelated, together they caused a tremendous amount of concern and agitation among prisoners and a series of unneeded headaches for staff and jail managers. The confluence of these infrastructure breakdowns may have been unusual, but the ageing and continued overcrowding of the facility seem to promise more of the same. As with overcrowding and staffing, the Sheriff and his staff must deal with immediate needs but those choices should be guided by a clear, realistic long -term plan for the jail.

## Remediation Plans

In the course of my first visit to the jail I heard of several "plans" for solving different aspects of the jail's problems, but it was never clear how seriously anyone takes them. I heard discussions about a request to the Board of Commissioners to lease the nearby Sears Warehouse to provide beds for inmate housing .A document provided by the Sheriff's Office describes "design proposals" for a three-phase project at the Warehouse that could provide 3,000 beds over the next three to five years.

Even before my first visit I heard rumors of the possibility of a deal with the City of Atlanta involving land swaps and the use of the City Jail. There is talk of a recommendation to the Board of Commissioners for a video visitation system to link the jail with the southern part of the state and add 400 additional beds to board prisoners at half the local cost.

I have a draft of a Request for Proposal for a Feasibility Study for the Fulton County Jail, which is intended to identify and analyze jail capacity needs through the year 2031, recommend program and construction options to meet those needs and recommend short term options as well. The dates are blank on the draft I have, so it is difficult to know the status of the request and whether it is being actively pursued  Finally, I have been told that there is a major, multi-million dollar project, at some stage of development, to replace or renovate the whole physical infrastructure of the existing jail.

Long term plans like these certainly will be necessary for the separate remedies, which are now being applied piecemeal to the jail, to coalesce into a permanent, operationally sound and constitutional solution. It is unclear whether the ideas currently in circulation have the political vitality and substance to be considered as such comprehensive plans, or whether they serve as distractions from the difficult tasks at hand. Perhaps the vagueness of these proposals or their potential for being at cross-purposes lies only in my incomplete and foggy understanding of the situation. In that case, I look forward to being enlightened.

## Conclusion

Numerous provisions of the Consent Order go unmentioned in this report; that can be corrected in future reports  I have raised some of the larger issues here because it seemed important to address them early on. This report's focus on long-term solutions, however, does not excuse the defendants' non-compliance with the immediate requirements of the Consent Order, particularly the population limits. The nearly continuous violation of those provisions demands swift action, even as more comprehensive planning continues

The long history of problems in the Fulton County Jail with its Byzantine tangle of competing interests, politics and personalities makes

an intrinsically complicated problem even more difficult to solve For all of those reasons, there is a clear need for strong leadership to emerge from among the county defendants. The parties have agreed upon the path to follow and the Court has approved it. It's time for action.

May 11, 2006

                Respectfully submitted,

                Patrick D. McManus
                Court Monitor